UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
1250 NORTH SD, LLC, SAN DIEGO HOTEL
CIRCLE OWNER, LLC, 1250 NORTH SD MEZZ
LLC, SAN DIEGO HOTEL CIRCLE MEZZANINE,
LLC,

Case No.:

**COMPLAINT**

       Plaintiffs,

 v.

LADDER CAPITAL FINANCE LLC,

       Defendant.
---------------------------------------------------------------X

   Plaintiffs 1250 North SD, LLC ("1250 NSD"), San Diego Hotel Circle Owner, LLC ("SDHC"), 1250 North SD Mezz LLC ("1250 NSD Mezz"), and San Diego Hotel Circle Mezzanine, LLC ("SDHC Mezz"), for their Complaint against Defendant Ladder Capital Finance LLC ("Ladder" or "Defendant"), alleges as follows:

## PARTIES

   1. Plaintiff 1250 North SD, LLC, is a Delaware limited liability company with its principal place of business in Laguna Hills, California.

   2. Plaintiff San Diego Hotel Circle Owner, LLC, is a Delaware limited liability company with its principal place of business in Westmont, Illinois.

   3. Plaintiff 1250 North SD Mezz LLC is a Delaware limited liability company with its principal place of business in Laguna Hills, California.

   4. Plaintiff San Diego Hotel Circle Mezzanine, LLC, is a Delaware limited liability company with its principal place of business in Westmont, Illinois.

5. Defendant Ladder Capital Finance LLC is a Delaware limited liability company with its principal place of business in New York, New York. Upon information and belief, the member(s) of Ladder are citizens of the State of New York.

## JURISDICTION AND VENUE

6. Plaintiffs' members are domiciled in the States of California, Illinois, Texas, and Arizona. Therefore, for purposes of diversity jurisdiction, Plaintiffs are, and at all times relevant were, citizens of the states of California, Illinois, Texas and Arizona. This Court therefore maintains original jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship and an amount in controversy greater than $75,000.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant has its principal place of business in New York, New York, and thus resides within the Southern District of New York.

8. This Court has personal jurisdiction over Defendant.

## FACTUAL BACKGROUND

### THE HOTEL PROPERTIES

*The DoubleTree by Hilton, San Diego – Hotel Circle*

9. The DoubleTree by Hilton, San Diego – Hotel Circle is located at 1515 Hotel Circle South, San Diego, California 92108 (the "San Diego Hotel"), and is owned by Plaintiffs 1250-NSD (55.230%) and SDHC (44.770%), as tenants in common.

10. SDHC is fully owned by Plaintiff SDHC Mezz, which is fully owned by non-party San Diego Hotel Circle Holdings, LLC, a Delaware limited liability company ("SDHCH").

11. SDHCH is owned by two members: non-party San Diego Hotel Investments LLC ("SDHI") holds a majority share (55.327%) and non-party PH San Diego Hotel Circle, LLC ("PHSD") holds the remaining share (44.673%).

2

12. SDHI is managed, directly or indirectly, by non-party Oak Coast Properties, LLC, and its affiliates (collectively, the "Oak Coast Entities"). PHSD is managed, directly or indirectly, by non-party PHRI, LLC, and its affiliates (collectively, the "Portfolio Entities").

13. SDHI and PHSD's respective member obligations to SDHCH are governed by that certain Limited Liability Company Operating Agreement of San Diego Hotel Circle Holdings, LLC dated March 16, 2015 (the "SDHCH Operating Agreement"). A true and correct copy of the SDHCH Operating Agreement is attached hereto as Exhibit 1.

*Residence Inn South Bend and Residence Inn Winston-Salem*

14. The Residence Inn South Bend is located at 716 North Niles Avenue, South Bend, Indiana 46617 (the "South Bend Hotel"), and is owned by non-party South Bend Hotel Owner, LLC ("SB-HO").

15. The Residence Inn Winston-Salem is located at 7835 North Point Boulevard, Winston-Salem, North Carolina 27106 (the "Winston-Salem Hotel"), and is owned by non-party Winston-Salem Hotel Owner, LLC ("WS-HO").

16. SB-HO and WS-HO are each fully owned by non-party Winston-Salem Hotel Holdings, LLC ("WSHH").

17. WSHH is owned by two members: non-party Winston Salem RI, LLC ("WSRI") holds a majority share (90.00%) and non-party PH Winston-Salem, LLC ("PHWS") holds the remaining share (10.00%).

18. WSRI is managed, directly or indirectly, by the Oak Coast Entities. PHWS is managed, directly or indirectly, by the Portfolio Entities.

19. WSRI and PHWS's respective obligations to WSHH are governed by that certain Amended and Restated Limited Liability Company Operating Agreement of Winston-Salem

Hotel Holdings, LLC dated July 6, 2015 (the "WSHH Operating Agreement"). A true and correct copy of the WSHH Operating Agreement is attached hereto as Exhibit 2.

20. The San Diego Hotel, the South Bend Hotel, and the Winston-Salem Hotel are sometimes collectively referred herein as the "Hotel Properties."

## THE SUBJECT LOANS FOR THE HOTEL PROPERTIES

*San Diego Senior Loan*

21. On March 27, 2015, Ladder made a $36,700,000 loan (the "Senior Loan") to both 1250 NSD and SDHC, the two owners of the San Diego Hotel. 1250 NSD and SDHC are collectively referred herein as the "Senior Borrowers." The Senior Loan is evidenced by (a) that certain Loan Agreement, dated March 27, 2015, executed by the Senior Borrowers (the "Senior Loan Agreement"), and (b) that certain Promissory Note, dated as of March 27, 2015, in the original principal amount of $36,700,000, the makers of which are the Senior Borrowers (the "Senior Note"). True and correct copies of the Senior Loan Agreement and Senior Note are attached hereto, respectively, as Exhibits 3 and 4.

22. As security for the Senior Note, the Senior Borrowers, jointly and severally as tenants in common, executed that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated March 27, 2015 (the "Senior DOT"), pledging the San Diego Hotel and improvements on it as security for the loan. A true and correct copy of the Senior DOT is attached hereto as Exhibit 5.

*San Diego Mezzanine Loan*

23. On March 27, 2015, Ladder made an additional $5,750,000 loan (the "Mezz Loan") to both 1250 NSD Mezz and SDHC Mezz. As noted above, 1250 NSD Mezz and SDHC Mezz each hold 100% of the membership interests in, respectively, 1250 NSD and SDHC. And, as noted above, 1250 NSD and SDHC together own 100% of the San Diego Hotel.

4

24. 1250 NSD Mezz and SDHC Mezz are collectively referred herein as the "Mezz Borrowers." The Mezz Loan is evidenced by (a) that certain Mezzanine Loan Agreement, dated March 27, 2015, executed by the Mezz Borrowers (the "Mezz Loan Agreement"), and (b) that certain Promissory Note (Mezzanine), dated as of March 27, 2015 and which the Mezz Borrowers executed in Ladder's favor, in the original principal amount of $5,750,000 (the "Mezz Note"). True and correct copies of the Mezz Loan Agreement and Mezz Note are attached hereto, respectively, as Exhibits 6 and 7.

25. In connection with the Mezz Note, the Mezz Borrowers executed that certain Pledge and Security Agreement, dated March 27, 2015 (the "Mezz Pledge Agreement"), and pledged, as security for the Mezz Note, all of the Mezz Borrowers' right, title and interest in and to the equity ownership interests in the Senior Borrowers who own, as tenants in common, 100% of the San Diego Hotel. A true and correct copy of the Mezz Pledge Agreement is attached hereto as Exhibit 8.

*Winston-Salem Loan*

26. On July 5, 2018, Ladder loaned $4,920,000 (the "WS Loan") to WS-HO, the 100% owner of the Winston-Salem Hotel. WS-HO is also referred herein as the "WS Borrower." The WS Loan is evidenced by (a) that certain Loan Agreement, dated as of July 5, 2018, executed by WS Borrower (the "WS Loan Agreement"), and (b) that certain Promissory Note, dated as of July 5, 2018 and which the WS Borrower executed in Ladder's favor, in the original principal amount of $4,920,000 (the "WS Note"). True and correct copies of the WS Loan Agreement and WS Note are attached hereto, respectively, as Exhibits 9 and 10.

27. As security for the WS Note, WS Borrower executed that certain Deed of Trust, Assignment of Leases and Rents and Security Agreement, dated as of July 5, 2018 (the "WS DOT"), the grantor under which is WS Borrower, which encumbers the Winston-Salem Hotel

and improvements thereon. A true and correct copy of the WS DOT is attached hereto as Exhibit 11.

*South Bend Loan*

28. On July 5, 2018, Ladder loaned $5,550,000 (the "SB Loan") to SB-HO, the 100% owner of the South Bend Hotel. SB-HO is also referred herein as the "SB Borrower." The SB Loan is evidenced by (a) that certain Loan Agreement, dated as of July 5, 2018, executed by SB Borrower (the "SB Loan Agreement"), and (b) that certain Promissory Note, dated as of July 5, 2018 and which the SB Borrower executed in Ladder's favor, in the original principal amount of $5,550,000 (the "SB Note"). True and correct copies of the SB Loan Agreement and SB Note are attached hereto, respectively, as Exhibits 12 and 13.

29. As security for the SB Note, SB Borrower executed that certain Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of July 5, 2018 (the "SB Mortgage"), the grantor under which is SB Borrower, which encumbers the South Bend Hotel and improvements thereon. A true and correct copy of the SB Mortgage is attached hereto as Exhibit 14.

### LADDER BREACHED THE LOAN DOCUMENTS BY ISSUING A DEFAULT ON THE LOANS, ACCELERATING THE INDEBTEDNESS ON THE NOTES, REFUSING TO CONSENT TO A MANAGEMENT CHANGE TO CURE THE PURPORTED DEFAULT, AND, IN THE MEANTIME, COERCING A MILLION DOLLARS IN FEES FROM BORROWERS

30. The scope of Ladder's misconduct in this case is comprehensive and varied, but it largely culminated in the issuance of an improper and impermissible notice of default and acceleration in October of this year.

31. Ladder contended, as the purported basis of that purported default, that on or about October 2, 2018, Michael Payne, Helmut Horn and GH Holdings Corporation attempted to transfer a majority of the equity interests in PHSD's manager PHRI, LLC ("PHRI"), together

6

{00404761.DOCX; 2}

with all voting and distribution rights and all other rights under PHRI's operating agreement (the "PHRI Equity Transfers"), to CHRG, LLC ("CHRG").  In addition to the PHRI Equity Transfers, PHRI's Manager, Graham Hershman, transferred control of PHRI to CHRG, LLC (together with the PHRI Equity Transfers, the "CHRG Transfers").[1]  PHSD, as noted, held the Portfolio Entities' interest in the San Diego Hotel, and thus, in simple terms, transferring all rights and interests in PHSD's manager (PHRI) to CHRG effectively transferred the Portfolio Entities' management and voting rights in the San Diego Hotel to CHRG.

32.     In response to the CHRG Transfers, Ladder indicated that it believed that this transaction constituted a default under the above-referenced Loan Agreements, and variously threatened to issue a default notice against the Borrowers and to accelerate the loans so that all indebtedness on the notes is immediately due and payable.  Ladder also threatened to initiate foreclosure proceedings against the Hotel Properties and the Mezz Borrowers' membership interests in the Senior Borrowers that own the San Diego Hotel.  But Ladder, prior to October 14, 2019, did not issue a written notice of default identifying the asserted breach of the Loan Agreement, or otherwise afford Plaintiffs the opportunity to cure the purported default.

33.     Instead, Ladder embarked on a campaign to extract – by coercion – excessive and synthetic "fees" from the Borrowers and their members, all under the threat of imminent foreclosure proceedings.  That coercive offensive began in March 2019, when Ladder demanded $500,000 from the Borrowers as a form of backdoor "forbearance fee" to spare the borrowers

---

[1] Ladder asserted in the Default Letters (as defined below) that the subject transfers occurred in October 20**19**, as opposed to 20**18**.  The Portfolio Entities asserted that this is a typographical error in Ladder's Default Letters.  Ladder has neither admitted nor denied that it stated the wrong year in the Default Letters.  For purposes of this Complaint, it will be assumed that there was a typographical error in the Default Letters, and the correct year for the CHRG Transfers was 2018.

from an immediate move to foreclose on, among other things, all security collateralizing the Mezz Loan.  Given the threat, and in an effort to facilitate good faith discussions with Ladder and in the process understand the unspecified default – and, significantly, address that claimed default with the Portfolio Entities – the Oak Coast Entities paid Ladder $500,000 in "forbearance fees" on or about March 8, 2019.  Those fees were paid despite the fact that the Oak Coast Entities did not concede or agree that any event of default had occurred – they had not, for example, consented to the PHRI Equity Transfers, and no change in management or control of the Borrowers could be effected without that consent – and specifically to protect against Ladder precipitously issuing the defaults and accelerations on the subject loans while the Oak Coast Entities were attempting to navigate the PHRI Equity Transfers and their potential implications. In exchange for the payment, Ladder agreed to not exercise its "rights and remedies *arising from defaults on the Loans* through June 8, 2019."  A true and correct copy of a letter confirming the payment dated March 27, 2019 is attached hereto as Exhibit 15.

34. The Oak Coast Entities attempted, after March 8, 2019, to address and resolve any issues deriving from the PHRI Equity Transfers.  They repeatedly engaged directly with the Portfolio Entities, in an effort to secure documentation reflecting the purported transfers, and to induce the Portfolio Entities to fulfil their fiduciary duties as manager of the Borrowers.  That proved futile, with the Portfolio Entities consistently stymying all efforts at cooperation and coordination.

35. The Oak Coast Entities fared no better with Ladder, which refused to commit the asserted default to writing or otherwise explain what specifically constituted the default and thus, by extension, how it could be cured.  Ladder instead persisted in its demand for unwarranted forbearance fees, and again underscored those demands with a threat of acceleration of the debt

and foreclosure. Indeed, in or around late May/early June, Ladder again threatened to put the loans into default, accelerate the loans, and commence foreclosure proceedings against the real and personal property for the Hotel Properties unless the Borrowers paid another $500,000 in fees.

36. The Oak Coast Entities, still laboring between two hostile and uncooperative business partners, concluded they had little or no choice but to accede to these threats. Accordingly, on or about June 8, 2019, they paid another $500,000 to Ladder, again under the coercive threats from Ladder. Ladder extended the "forbearance term" to September 10, 2019.

37. At that point, the Oak Coast Entities resolved that neither the Portfolio Entities nor Ladder had any interest or willingness to engage in good faith efforts to address and settle the dispute that had arisen in the wake of the PHRI Equity Transfers. Each was instead determined to avoid any responsibility attendant to its own conduct, and in the process foist all risk and prospective liability onto the Oak Coast Entities.

38. Just as important, it was additionally clear that whatever the specific parameters of the PHRI Equity Transfers – and the Oak Coast Entities have not, to date, received any documentation reflecting those transactions, despite repeated requests – Ladder had seized on those transfers to force further and apparently endless concessions in connection with the Mezz Loan. The Oak Coast Entities, in other words, were being subjected to potential liability and risk due to the conduct of the Portfolio Entities. And given the continuing threats from Ladder, it became apparent that something must be done to begin effectuating a cure for this purported default – notwithstanding that Ladder maintained its refusal to specify the default in writing.

39. Accordingly, in an effort to avoid the imposition of additional forbearance fees, the Oak Coast Entities sent three letters on June 12, 2019 to the Portfolio Entities declaring that

the CHRG Transfers are a "Bad Act" under the SDHCH and WSHH Operating Agreements for the Hotel Properties, and that the Oak Coast Entities reserve all rights to replace the Portfolio Entities as the managing members of SDHCH and WSHH (collectively, the "Companies"), which manage the Hotel Properties and Loans.  A true and correct copy of these letters dated June 12, 2019, are attached collectively hereto as Exhibit 16.

40. The Oak Coast Entities followed those letters in short order with a request that Ladder consent in writing to the replacement of the Portfolio Entities as managing member of SDHCH and WSHH, and to the replacement of the Portfolio Entities as the property managers for the Hotel Properties.  That request was made under Section 4.2.1 of the subject loan agreements, which required the Oak Coast Entities to obtain Ladder's "prior written consent" before removing the Portfolio Entities as the Managing Member of the Companies, and as the property manager for the Hotel Properties.  *See* Exs. 3 [Senior Loan Agreement, § 4.2.1], Ex. 6 [Mezz Loan Agreement, § 4.2.1]; Ex. 9 [WS Loan Agreement, § 4.2.1], and Ex. 12 [SB Loan Agreement, § 4.2.1].

41. What followed was months of mounting frustration on the Oak Coast Entities' part, as they attempted to facilitate a form of consent that should have been *pro forma* under the circumstances.  Ladder had claimed – though not in writing – that the PHRI Equity Transfers were an event of default, and the Oak Coast Entities were actively attempting to cure that default.  That effort should have been met with enthusiasm from the lender, since it reflected a borrower moving to resolve a problem the lender itself had raised.  But this lender, Ladder, neither consented nor explicitly refused.  It opted instead to hold the Oak Coast Entities in contractual limbo, insisting that there was some kind of default, refusing to provide the requested consent to remove the Portfolio Entities as managers, but, of course, demanding further "forbearance

payments" to address the "default" it would neither specify in writing nor consent to the Oak Coast Entities curing.

42. After months of this cycle of requests for consent and responsive obstruction and obfuscation from Ladder, the Oak Coast Entities concluded they could no longer be subjected to the legal purgatory Ladder seemed determined to place them in. Accordingly, by letter dated August 30, 2019, they informed Ladder that unless it consented to the replacement of the managing members and property managers for, respectively, the Companies and the Hotel Properties, they would be compelled to act on their own:

> [G]iven that the Lender has alleged certain events of default while the Portfolio Entities have been in charge of the Hotel Properties (which, for reasons we wrote you in the past, we dispute), our clients are left with little choice but to exercise their fiduciary duties by removing the Portfolio Entities as managing members (to be replaced by one of the Oak Coast Entities). Additionally, our clients intend to remove and replace the Portfolio Entities' affiliated property/asset management companies, i.e., Portfolio Hotels, LLC and PHRM #1, LLC, with another reputable and qualified property/asset management company to manage all three Hotel Properties.
>
> …
>
> Out of an abundance of caution, however, we are providing the Lender until **3:00 p.m. PDT on September 5, 2019** to provide us a specific written objection if it objects to our clients' plan of action. If we do not hear from you, we will assume that no such objection is made and we will move forward with the above-intended plan of action.

A true and correct copy of this letter dated August 30, 2019, is attached hereto as Exhibit 17 (the "August 30 Letter").

43. Ladder responded in unfortunately typical fashion on September 3, 2019, purposefully withholding the requested written consent, and instead demanded *another* $500,000

11

in forbearance fees *prior to* the September 5, 2019, 3:00 p.m. PDT, deadline.  A true and correct copy of the September 3, 2019 letter is attached hereto as Exhibit 18.

44. The most benign interpretation of this most recent demand was that Ladder, in an obvious *quid pro quo*, was demanding $500,000 in "fees" as the price of the consent it should have provided under the loan agreements when the request was initially made in March 2019. The more likely reality, however, was that Ladder's demand was a calculated attempt to coerce additional fees from the Borrowers by the September 5, 2019 deadline, after which it would still refuse consent.  Either way, Ladder unreasonably withheld consent for SDHI and WSRI to replace, respectively, PHSD and PHWS as manager of the Companies, for no good cause other than to strong-arm Borrowers into paying more "forbearance fees."

45. The Oak Coast Entities reasonably refused Ladder's coercive demand for yet another $500,000 payment.  That refusal to consent to demands and coercion did not sit well with Ladder, which responded by affirmatively refusing to give consent to the management change.

46. Indeed, in a September 4, 2019 letter, Ladder's counsel articulated that refusal unambiguously:  "Lender is advised of your clients' current intentions with respect to management of the borrowing entities, ***and, as has been the case before, declines to provide any written consent with respect thereto***."  In this same email, Ladder again demanded $500,000 in 24 hours based on the existence of a purported default without setting forth any specific information as to how a default occurred.  A true and correct copy of the September 4 email is attached hereto as Exhibit 19.

47. Ladder's recalcitrance remained as of September 10, 2019.  This, despite the fact that Ladder understood that the Oak Coast Entities would be the entities to replace the Portfolio

12

Entities as managing members of the Companies, and there would be no change in ownership of the Hotel Properties.  Ladder also understood there would be no transfer of ownership as to the Senior Borrowers, Mezz Borrowers, SB Borrower and/or WS Borrower, and all Borrowers would remain liable on the notes and the Hotel Properties were not prejudiced in any way.  There was, in short, no legitimate reason to refuse the request for written consent.  A true and correct copy of the September 10 Email is attached hereto as Exhibit 20.

48. Ladder's posture placed the Oak Coast Entities in a precarious and ultimately untenable position.  Since it eventually became apparent that Ladder maintained that the CHRG Transfers –to which the Oak Coast entities had not consented—constituted a default under the loan agreements, the Oak Coast Entities felt compelled (among other reasons) to remove the Portfolio Entities as the managing members of the Companies to protect the Borrowers under the subject loans.  And the proposed removal of PHSD and PHWS was a reasonable attempt to cure the purported default that Ladder insisted has transpired.  But rather than give the written consent to cure the purported default, Ladder–in addition to demanding previously, and receiving, $1,000,000 in alleged "forbearance fees" – continued unreasonably to refuse written consent as of September 10, 2019.

49. Finally, on September 11, 2019, Ladder intimated for the first time that "[s]ubject to Lender performing its standard due diligence, and Lender's receipt of satisfactory results therefrom, Lender would be willing to provide its consent to Oak Coast to serving as manager." A true and correct copy of Lender's letter dated September 11, 2019 ("September 11 Letter"), is attached hereto as Exhibit 21.

50. Missing from Lender's September 11 Letter was any list of documents required for the purported "due diligence" or any timetable for review.  What *was* included in the letter,

13

rather astonishingly, was yet another demand to pay, this time, $200,000 (reduced from its earlier demand of $500,000) in fees to avoid issuance of a default. In other words, Ladder continued its demand for immediate payments under the threat of issuing a default as it slow-played a "due diligence review" to cure the purported default.

51. This belated insistence that Ladder needed to perform "due diligence" was in fact a transparent and disingenuous attempt to back pedal from its prior refusal for several months to give written consent to the change in membership. But that delay had caused substantial damage to the Oak Coast Entities, the Hotel Properties, and the Companies. That included the filing of two lawsuits in the Superior Court of California, County of Orange, entitled *SD Hotel Investments LLC, et al. v. PH San Diego Hotel Circle, LLC, et al.*, Case No. 30-2019-01097240-CU-BC-CJC, and *PH San Diego Hotel Circle, LLC, et al. v. SD Hotel Investments LLC, et al.*, Case No. 30-2019-01107574-CU-BC-CJC.

52. Curiously, having undertaken its due diligence – and having received documentation from the Oak Coast Entities to do so – Ladder issued written notices of default and acceleration for the first time on October 14, 2019. It did so by way of three default letters to the Borrowers declaring the Mezz Loan, the SB Loan and the WS Loan in default (collectively, the "Default Letters"), and accelerating all indebtedness under the loans as immediately due and payable. All three Default Letters asserted the CHRG Transfers as the breach of the Loan Documents triggering the defaults. True and correct copies of the Default Letter are attached hereto as Exhibit 22.

53. While Ladder coerced Borrowers into paying a million dollars based on a purported default that had not been reflected in any written notice, and then finally issued the

14

written Default Letters, the fact remains that this "default," as alleged by Ladder, might have been no default at all.

54. First, Ladder's default in the Default Letters asserted the CHRG Transfers occurred in 2019, when they apparently occurred a year earlier in 2018. And according to the Portfolio Entities, Ladder knew of these transfers in 2018 and consented to them.

55. Second, according to the Portfolio Entities, Ladder's description of these transfers contain significant factual errors. The declaration of Graham Hershman – the sole manager of PHRI – asserts, for example, that: "So it is clear, the 'CHRG Transfer' refers to an acquisition of a membership interest by CHRG Perillo, LLC in PHRI. Notwithstanding the acquisition, the management team of PHRI (myself, Michael Payne and Helmut Horn) has remained intact, and I remain PHRI's sole manager. There has been no change in the structure or operating control of PHRI." A true and correct copy of the Declaration of Graham Hershman in Opposition to Plaintiffs' Ex Parte Application for an Order to Show Cause re Preliminary Injunction and Temporary Restraining Order (without exhibits) is attached hereto as Exhibit 23.

*Ladder Issues Notice of Public Sale of Collateral Under UCC Article 9*

56. By letter dated November 19, 2019, received by Plaintiffs on November 20, 2019, Ladder gave notice that, on December 17, 2019, at 10:00 a.m., in front of the New York County Supreme Court building, Ladder will sell, at public auction, 100% of the membership interests in each of 1250 NSD and SDHC, who are the owners of the San Diego Hotel. Ladder hired Jonathan Cuticelli of Sheldon Good & Company, a licensed auctioneer, to conduct the auction. A true and correct copy of the notice of sale is attached hereto as Exhibit 24.

# CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (SENIOR BORROWERS' CLAIM FOR BREACH OF WRITTEN CONTRACT AGAINST LADDER)

57. Plaintiffs repeat each of the foregoing allegations as if fully set forth herein.

58. On or about March 27, 2015, Senior Borrowers and Ladder entered into the Senior Loan Agreement, Senior Note, and Senior DOT (collectively, with all other documents evidencing the Senior Loan, the "Senior Loan Documents").

59. Senior Borrowers performed all of their obligations under the Senior Loan Documents, except for those that are excused by Ladder's breach.

60. Ladder breached the Senior Loan Documents by: (a) coercing extracontractual forbearance fees from Senior Borrowers on misinformation about a purported default caused by the Portfolio Entities; and (b) unreasonably refusing to consent to a management change that would have cured the purported default committed by the Portfolio Entities.

61. As a proximate result of Ladder's breach of contract, Senior Borrowers have been damaged in an amount to be proven at trial, but in no event less than the jurisdictional minimum of this court.

### SECOND CLAIM FOR RELIEF
### (MEZZ BORROWERS' CLAIM FOR BREACH OF WRITTEN CONTRACT AGAINST LADDER)

62. Plaintiffs repeat each of the foregoing allegations as if fully set forth herein.

63. On or about March 27, 2015, Mezz Borrowers and Ladder entered into the Mezz Loan Agreement, Mezz Note, and Mezz Pledge Agreement (collectively, with all other documents evidencing the Mezz Loan, the "Mezz Loan Documents").

64. Mezz Borrowers performed all of their obligations under the Mezz Loan Documents, except for those that are excused by Ladder's breach.

16

65. Ladder breached the Mezz Loan Documents by: (a) issuing a default on improper and incorrect information against the Mezz Loans; (b) improperly accelerating all indebtedness under the Mezz Loan and making the Mezz Note immediately due and payable; (c) coercing extracontractual forbearance fees from Mezz Borrowers on misinformation about the purported default; (d) threatening to foreclose on the Mezz Borrowers' membership interests of Senior Borrowers unless forbearance payments were made; (e) unreasonably refusing to timely consent to a management change that would have cured the purported default committed by the Portfolio Entities; and (f) improperly seeking to foreclose on the Mezz Borrowers' collateral and dispose of 100% of the membership interests in each of 1250 NSD and SDHC at a public auction to be held on December 17, 2019.

66. As a proximate result of Ladder's breach of contract, Mezz Borrowers have been damaged in an amount to be proven at trial, but in no event less than the jurisdictional minimum of this court.

### THIRD CLAIM FOR RELIEF
### (SENIOR BORROWERS' CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST LADDER)

67. Plaintiffs repeat each of the foregoing allegations as if fully set forth herein.

68. On or about March 27, 2015, Senior Borrowers and Ladder entered into the Senior Loan Documents, which impose upon Ladder a duty of good faith and fair dealing in the performance of the contracts and in their performance. Specifically, an implied duty was imposed on the contracting parties that neither party will do anything which would injure the right of the other to receive the benefits of the contracts.

69. The written contracts' purpose was for Ladder to fund a loan in connection with the San Diego Hotel. Ladder breached this covenant when it undertook affirmative acts by: (a)

17

coercing forbearance fees from Senior Borrowers on misinformation about a purported default caused by the Portfolio Entities; and (b) unreasonably refusing to consent to a management change that would have cured the purported default committed by the Portfolio Entities.

70. Moreover, Ladder failed and refused to discharge its contractual responsibilities, promoted not by an honest mistake, bad judgment or negligence, but rather by conscious and deliberate acts that unfairly frustrated the written contracts' agreed common purpose and frustrated the Senior Borrowers' reasonable expectation thereby depriving Senior Borrowers of the benefits of the written contracts.

71. Ladder's breach of the covenant of good faith and fair dealing damaged the Senior Borrowers in an amount to be proven at trial, but in no event less than the jurisdictional minimum of this court, by preventing them from receiving their bargained for benefits under the written contracts.

**FOURTH CLAIM FOR RELIEF**
**(MEZZ BORROWERS' CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST LADDER)**

72. Plaintiffs repeat each of the foregoing allegations as if fully set forth herein.

73. On or about March 27, 2015, Mezz Borrowers and Ladder entered into the Mezz Loan Documents, which impose upon Ladder a duty of good faith and fair dealing in the performance of the contracts and in their performance. Specifically, an implied duty was imposed on the contracting parties that neither party will do anything which would injure the right of the other to receive the benefits of the contracts.

74. The written contracts' purpose was for Ladder to fund a loan in connection with the San Diego Hotel. Ladder breached this covenant when it undertook affirmative acts by: (a) issuing a default on improper and incorrect information against the Mezz Loans; (b) improperly accelerating all indebtedness under the Mezz Loan and making the Mezz Note immediately due

and payable; (c) coercing forbearance fees from Mezz Borrowers on misinformation about the purported default; (d) threatening to foreclose on the Mezz Borrowers' membership interests of Senior Borrowers unless forbearance payments were made; (e) unreasonably refusing to timely consent to a management change that would have cured the purported default committed by the Portfolio Entities; and (f) improperly seeking to foreclose on the Mezz Borrowers' collateral and dispose of 100% of the membership interests in each of 1250 NSD and SDHC at a public auction to be held on December 17, 2019.

75. Moreover, Ladder failed and refused to discharge its contractual responsibilities, promoted not by an honest mistake, bad judgment or negligence, but rather by conscious and deliberate acts that unfairly frustrated the written contracts' agreed common purpose and frustrated the Mezz Borrowers' reasonable expectation thereby depriving Mezz Borrowers of the benefits of the written contracts.

76. Ladder's breach of the covenant of good faith and fair dealing damaged the Mezz Borrowers in an amount to be proven at trial, but in no event less than the jurisdictional minimum of this court, by preventing them from receiving their bargained for benefits under the written contracts.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant as follows:

(A) On the First Cause of Action, for breach of contract, in an amount to be determined at trial, plus interest and costs;

(B) On the Second Cause of Action, for breach of contract, in an amount to be determined at trial, plus interest and costs;

(C) On the Third Cause of Action, for breach of the implied covenant of good faith and fair dealing, in an amount to be determined at trial, plus interest and costs; and

(D) On the Fourth Cause of Action, for breach of the implied covenant of good faith and fair dealing, in an amount to be determined at trial, plus interest and costs;

(E) For such other and further relief as this Court may deem just and proper.

Dated: November 26, 2019
New York, New York

COHEN TAUBER SPIEVACK & WAGNER P.C.

By:_____
Stephen Wagner
Jackson S. Davis
420 Lexington Avenue, Suite 2400
New York, New York 10170
(212) 586-5800
swagner@ctswlaw.com

Todd M. Lander
Arash Beral
FREEMAN FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, California 90067
(310) 255-6164
*Pro Hac Vice Applications forthcoming*

*Counsel to Plaintiffs*